UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ALBERT RADSPIELER                              No. 20-


       Plaintiff,

Vs

CITY OF OTSEGO, MICHIGAN;
CITY OF OTSEGO POLICE DEPARTMENT,
BRANDON WEBER, individually and in his
official capacity, and, GORDON KONKLE,
individually and in his official capacity,


       Defendants.

_____/

## <u>VERIFIED COMPLAINT<br>AND JURY DEMAND</u>

    Plaintiff Albert Radspieler ("Radspieler") brings this Verified Complaint

against Defendant City of Otsego, Michigan ("the City"), Defendant City of

Otsego Police Department ("Police Department"), Brandon Weber ("Weber:), and

Gordon Konkle ("Konkle"), and states as follows:

## INTRODUCTION

    1.    Radspieler files this 42 U.S.C. § 1983 action, because all Defendants

are responsible for police officer Brandon Weber violating Radspieler's rights

under the 4th and 14th Amendments to the United States Constitution through an

illegal stop for allegedly speeding while travelling on a City road and through the use of excessive and illegal force against him after the stop.

2.      Radspierler also files this 42 U.S.C. § 1983 action, because the City and Defendant Konkle have denied him the equal protection of the law guaranteed by the 5th and 14th Amendments and have denied him free speech guaranteed by the 1st and 14th Amendments to the United States Constitution.  Those defendants (1) imposed on Radspieler discriminatory, retaliatory, and unjustified penalties for alleged blight violations at properties owned by Radspieler within the City limits and (2) inflated the assessed values of the properties he purchased.

3.  Radspieler seeks injunctive relief, monetary damages and other relief.

PARTIES, JURISDICTION AND VENUE

4.      Radspieler is a resident of Hopkins, Michigan and owns residential property in the City of Otsego.

5.      Otsego is a municipal corporation organized in and existing under the Constitution and laws of the State of Michigan.

6.      The City's Police Department is an official subdivision of the City, and all officers employed by the Police Department are employees of the City.

7.      Defendants City and Police Department were at all times mentioned engaged in owning, operating, maintaining, managing and doing business as a Police Department in Allegan County and in the business of public safety for the residents

of the City of Otsego, Allegan County, Michigan.  All of the acts complained of in this Complaint by Plaintiff against Defendants were done and performed by Defendants by and through their authorized agents, servants and/or employees, and each of them, all of whom at all relevant times were acting within the course, purpose and scope of that agency, service and/or employment capacity. Moreover, Defendants and their agents ratified all of the acts of which complaint is made.

8.      Defendant Gordon Konkle was at all relevant times the Chief of Defendant Police Department, and he, along with other officials of Defendant City, at all times possessed the power and the authority and were charged by law with the responsibility to enact policies and to prescribe rules and practices concerning the operation of Defendant Police Department. Konkle is sued individually and in his official capacity.

9.      Defendant Brandon Weber is an  officer, sergeant or lieutenant, who was at the time of committing the acts alleged, a duly authorized employee of Defendant City and its Police Department, who was acting within the course and scope of his respective duties and with the complete authority and ratification of Defendant City. At all relevant times, these Defendants, and each of them, were acting under color of law, that is, under the color of the statutes, ordinances, regulations, policies, customs and usages of Defendant City and State of Michigan. Weber is sued individually and in his official capacity.

10.    At all times mentioned, all Defendants were and are duly appointed officers, agents, and/or employees of Defendant City.

11.    At all times mentioned, each and every Defendant was the agent of each and every other Defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every Defendant named and unnamed in this Complaint.

12.    In doing the acts and failing and/or omitting to act as described below, Defendants, and each of them, were acting on the implied and/or with the actual permission and consent of Defendant City and were duly appointed agents, employees and/or representatives of Defendant City, acting in the course and scope of their employment and agency with Defendant City.

13.    Jurisdiction is proper under 28 U.S.C. §§1331and 1343, because federal questions are presented in this action under the United States Constitution and 42 U.S.C.§ 1983.

14.    Venue is proper under 28 U.S.C. §139l (b)(l) and (2) because this is the judicial district where the Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred or will occur.

## COMMON FACTUAL ALLEGATIONS

**Illegal Stop and Use of Excessive Force**

15.     Radspieler re-alleges and incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

16.     During the afternoon of August 19, 2017, Radspieler, then a 76-year-old Caucasian male, was peacefully and lawfully driving into the City in his Ford pickup truck.  Radspieler was driving eastbound on River Street just west of Watson Road, when he saw a marked police car travelling westbound on River Road turn around and pull in behind him.  Officer Brandon Weber was the driver of that police car.  River Street there was a two-lane road with insufficient space on the side of the road to accommodate a vehicle.

17.     When Radspieler saw the police car pull behind him, Radspieler suspected that the policeman intended to stop him.  Therefore, after crossing Watson Road, Radspieler on his own accord stopped in the road momentarily, opened his door and shouted back to Weber, "I am pulling into my driveway."  (Radspieler owned a house close (about four lots) within sight.)  When Radspieler headed to his house, Weber gave a short blip with his siren and followed Radspieler.  Radspieler stopped and activated his left turn signal at his neighbor's driveway.  But before he could turn left, Radspierler saw in his rearview mirror Weber jumping out of his car.

Then, Radspieler opened his driver's side door and looked back terrified to see Weber approaching him with gun drawn and pointed at Radspieler's face. As Weber approached Radspieler, Weber holstered his gun. Weber expressed that he had drawn his gun on Radspieler because he thought Radspieler "might be an ISIS terrorist."

18.     Officer Weber told Radspieler that Weber had stopped him because Radspieler was travelling 44 miles per hour on River Road where Weber said the speed limit was 25 miles per hour. Radspieler gave Weber his driver's license and vehicle registration. Weber issued Radspieler a civil infraction for driving 44 miles per hour in a 25 mile per hour zone.

19.     Based upon information and belief, the speed limit on the stretch of River Street where Weber accused Radspieler of speeding is not 25 miles per hour. The speed limits set by sub-section 2 of Michigan Codified Laws 257.627, in effect on August 19, 2017, were only then valid for the City of Otsego **if** a traffic control order setting the speed limit was filed with the City Clerk, unless the speed limits were for highways within mobile home parks or residential subdivisions. See MCL 257.627(11), (12). But there was no such traffic control order filed when Weber stopped Radspieler for allegedly speeding on August 19, 2017. And the area on River Road was not within a mobile home park or a residential subdivision. Therefore, there was no valid 25 mile per hour speed limit on River Street when

Weber stopped Radspieler.  In fact, none of the specific speed limits of MCL 257.627(2) applied.  If none of the specific speed limits in subsection 2 of the statute are valid, the basic speed law applies.  MCL 257.627 (2)("Except as provided in subsection (1), it is lawful for the operator of a vehicle to operate that vehicle on a highway at a speed not exceeding the following…")  The basic speed law states:

A person operating a vehicle on a highway shall operate that vehicle at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface, and width of the highway and of any other condition existing at the time. A person shall not operate a vehicle upon a highway at a speed greater than that which will permit a stop within the assured, clear distance ahead. A violation of this subsection shall be known and may be referred to as a violation of the basic speed law or "VBSL".

MCL 257.627 (1).  Weber had no evidence that Radspieler had violated the basic speed law.

20.     After Weber left, Radspieler was traumatized by Weber pulling a gun on him.  Visibly shaken, Radspieler went right away to see his friend and business associate Kelly McKewen, told him what had happened, and asked the friend to go with him to talk to Police Chief Konkle the next morning.

21.     Rule R-3 of the policies and procedures of the Otsego Police Department states:

E. Officers shall draw and display weapons only:

1.     Where an ordinary prudent officer would reasonably fear for his or her safety or the safety of others, or,

2.      Where an officer is authorized to use the weapon to effect an arrest as established by this procedure, or,

3.      For the purposes of destroying an animal, ballistics examination, training, or cleaning as provided by departmental directives or general orders.

4.      When a weapon is drawn or displayed in contact with a citizen under circumstances not requiring generation of a "Police Report", the incident will be documented either in the officer's report or in a memorandum to the Chief's Office if the incident did not result in the generation of a police report.

By pulling a gun on Radspieler, Weber violated the above policy and procedures of the City of Otsego Police Department

22.     A couple days after the incident, Radspieler and his friend went to see Chief Konkle to discuss the incident with Weber that previous day and to ask about the procedures and rules about police officers pulling guns on citizens.  Konkle stated that, whenever a weapon was drawn, department policy required that the officer report the incident in writing.  Konkle pulled out a report that Weber had written about the incident.  Konkle started to read the report out loud.  He read that Weber claimed that Radspieler was fleeing and alluding and that Weber had "chased him at least three blocks."  Then, Konkle said he could not read the rest because the handwriting was not clear.

23.     After hearing what Konkle read, Radspieler denied he had travelled three blocks, denied he was fleeing, and asserted that he was only trying to stop in a safe harbor where he would not obstruct traffic.  Radspieler told Konkle that he did not deserve to be traumatized by Weber accosting him with a gun.  Radspieler told

8

Konkle that, when he had asked Weber why he pulled the gun, Weber had said it was because he thought Radspieler might be an ISIS terrorist.

24.     Radspieler asked Konkle for a copy of the report that Konkle had started to read.  But Konkle refused because, Konkle said, it was not a police report but was an evaluative piece created on the department's behalf.  But Konkle gave Radspieler a copy of the DVD audio-video recording of the incident from Weber's dash cam.  The recording clearly showed: that Radspieler had not travelled three blocks from where he told Weber he was going to his driveway and that Radspieler was stopped with his left turn signal on waiting to turn left into a driveway when Weber accosted him with a gun.

25.     Chief Konkle concluded that Weber acted appropriately under the circumstances.  Konkle did not impose any consequences on Weber for pulling his gun on Radspieler.

26.     A few days later, Radspieler orally asked the City Clerk for a copy of the report that Konkle had read.  The clerk denied the report existed.  Then, after Radspieler's successive written requests under the Michigan Freedom of Information, the Clerk denied the request stating various reasons in succession:  (1) the report did not exist, (2) the report was exempt as investigative notes and records compiled for law enforcement purposes, (3) the report was exempt as a law enforcement officer's personal notes, (4) the report exempt because it was being

used in speeding ticket case. Later, the City claimed the report was exempt because it was placed in Weber's personnel file.

27.    Radspieler filed a complaint in the 48th Judicial Circuit Court to appeal the denial of his FOIA requests.  During the hearing on the City's motion for summary disposition of the complaint, the City Manager Aaron Mitchell, Chief Konkle, the Mayor and her husband, and the City Clerk were present in the courtroom.  Radspieler explained to the judge that he wanted Weber's report (1) to show the public that Weber had acted wrongfully, (2) to show that the City officials were corrupt and were covering up Weber's wrongdoing, and (3) to show that Weber lied when he said that Radspieler fled and eluded Weber for over three blocks.

28.    In District Court proceedings on the speeding ticket, Radspieler was unaware that there was no traffic control order supporting the 25 mile per hour speed limit posted where Weber claimed Radspieler was speeding.    Nonetheless, Radspieler did not admit to speeding.    Radspieler admitted responsibility for impeding traffic, paid the fine, and the speeding ticket was dismissed.

**Violation of Equal Protection and Guarantee of Free Speech**

29.    Radspieler re-alleges and incorporates by reference the allegations contained in the previous paragraphs as though fully set forth herein.

30.    Radspieler is a resident of Hopkins, Michigan.

31.     Radspieler buys old houses in the City of Otsego, restores them and sells them.

32.     In applying City ordinances and regulations to Radspierler in relation to the houses he has bought in the City, City officials, agents, and the City Police Department have treated Radspieler less favorably that other similarly situated property owners without a rational basis for the differing treatment.   The challenged government actions were motivated by animus, malice and ill will towards Radspieler personally unrelated to the Defendants' official duties.  As shown below, Chief Konkle orchestrated a campaign of harassment and discrimination against Radspieler in retaliation for Radspieler speaking out publicly about Weber's illegal stop and use of excessive force, about Konkle's refusal to impose any consequences on Weber, and about the City's refusal to release Weber's report on his use of force against Radspieler.

33.     During all relevant times, the City contracted with the company Professional Code Inspectors to serve as building inspector and code enforcement officer for the City.  Yet, in the following instances, so great was Konkle's interest in punishing Radspieler for speaking out against him, that Konkle personally inspected Radspieler's properties, personally issued warning notices, and, in one instance, personally issued a civil infraction.

34.     Before July 2, 2018, the City Code of Ordinances had adopted the

2012 International Property Maintenance Code and the later Code's section 308 governed blight violations within the City.  Section 308, Ex. 1.  Its basic provision is that "All *exterior property* and *premises* and the interior of every structure, shall be free from any accumulation of *rubbish* or garbage."  Rubbish is defined as "RUBBISH. Combustible and noncombustible waste materials, except garbage; the term shall include the residue from the burning of wood, coal, coke and other combustible materials, paper, rags, cartons, boxes, wood, excelsior, rubber, leather, tree branches, *yard* trimmings, tin cans, metals, mineral matter, glass, crockery and dust and other similar materials."  Section 202.

35.    On and after July 2, 2018, the City's Blight Code governed blight violations within the City.   Blight Code, Ex. 2.  The pertinent section states:

> All property owners or occupants shall be responsible for maintaining all exterior property areas in compliance with the following minimum requirements:
>
> (1)    Except for temporary accumulation in appropriate containers prior to periodic collection for proper disposal, all exterior property areas shall be properly maintained in a clean and sanitary condition, free from trash, rubbish, junk, physical hazards, rodent or insect harborage and infestation.
>
> (2)    All stored firewood shall be in neat, orderly stacks, unless screened from view from all adjoining properties.
>
> (3)    The storage and accumulation of any building material shall only be for a period that is reasonably necessary for the immediate use of such materials, but in no event longer than 60 days. Building materials must be piled off the ground so as not to become a suitable environment for rodents or similar vermin.

(4)    Operable equipment, machinery, building materials, or other items shall not be stored for periods of longer than 60 days in any truck trailer or other type of trailer, with or without its wheels.

(b)    Failure to maintain all exterior property areas in compliance with the requirements of this section shall constitute a blighted condition in violation of this article.

Ord. No. 161, § 1, 7-2-18 (emphasis added.)

**36.    132 West River Street:**  Radspieler owned the property at 132 W. River St. and was restoring the house there.  Before Radspieler bought the house, the residents, including children, lived in squalor.  Cat and dog excrement existed throughout the house.  City officials were aware of the conditions but not address it.

**37.**    After Radspieler began fixing up the house, he had a small pile of aluminum stacked beside the driveway.  He planned to scrap the aluminum.

**38.**    His neighbor had a pile of building materials next to a shed.  The pile had been in his yard for years and was obviously intended as a permanent fixture. Yet, on April 3, 2018, Chief Konkle personally inspected Radspieler's house and sent him a letter warning that, unless the pile was removed in ten days, Radspieler would receive a civil infraction ticket.  Even though Radspieler was restoring a dilapidated house which had existed for years, and, even though Radspieler was thus creating significant value added for the neighborhood, Konkle had the nerve to admonish him, "Your cooperation will help us maintain an attractive City."  Konkle issued no warning to the neighbor about the pile of building materials on his property.

39.    **365 W. Orleans**:  In 2017, the property at 365 W. Orleans had been ordered demolished.  The owner had challenged the order and the matter was being litigated.   The City Manager postponed the court date to give Radspieler an opportunity to negotiate the purchase of the property, because the City Manager liked the work that Radspieler had done on other houses.  On September 6, 2017**,** Radspieler bought the property for $2,500.00.  In 2017, before the incident where officer Weber assaulted Radspieler with a gun, Chief Konkle told Radspieler, "There should not be any fucking taxes at all, because it is in so bad a condition." But, after the incident with Weber, when Radspieler bought the property, the assessor would not decrease the value even though the house was in terrible shape.   [The City claimed that Radspieler's purchase of the property was an "invalid sale", even though the purchase was at arms' length.]

40.    On April 2, 2018, citizen Dave Cook of 416 W. Orleans addressed the City Commission about alleged blight conditions on the 300 block of Orleans. He displayed photographs and said that blight has existed for 23 years.  He specifically complained about the condition of the old Allegan School.  He suggested that the City adopt a blight ordinance.  He said he was working with Chief Konkle to address the alleged blight.

41.    Despite Mr. Cook's expressions of widespread blight on 300 block of Orleans that had allegedly existed for 23 years, on April 3, 2018 Chief Konkle issued

a warning letter *only to Radspieler* (who was working to restore the dilapidated house) for removal of "accumulation of trash, junk, and old furniture"  No warning letters were issued to any other property owners, including the owner of the old school to which Mr. Cook had specifically directed his complaint.

42.    On April 4, 2018, Radspieler spoke with the City Manager.  The City Manager told him to remove the pile of metal in the driveway of 365 W. Orleans by April 22, 2018.  Radspieler left the City Manager and went directly to 365 W. Orleans intending to start the clean-up.  When he arrived, the pile of metal was gone. A neighbor told him two men in a truck had picked up the pile and left.  Radspieler returned to the City Manager and reported the theft.  The City Manager said Radspieler was "all set." But Chief Konkle issued a civil infraction ticket to Radspieler.  At the pretrial hearing, the City's attorney refused to drop the charge. Radspieler served on the City Manager and Chief Konkle subpoenas to appear at trial.  A few days before trial, the City dropped the charge.

43.    In May 2019, Radspieler received a notice to see Kirk Scharphorn of Professional Code Inspectors at the latter's office in Dorr, Michigan.   When Radspieler arrived, Mr. Scharphorn told Radspieler that the City wanted him to repair the front instead of the back of the Orleans house (even though most of the damage was to the back of house which was in danger of collapsing.)  Mr. Scharphorn told Radspieler he disagreed with how the City was treating Radspieler

and his restoration of the City houses.  Scharphorn said Chief Konkle had called Scharphorn complaining that Radspieler was not working fast enough on his houses. Scharphorn told Radspieler that Chief Konkle had ordered "a cop named McGehee to get you." Scharphorn told Radspieler "They are out to get you."

44.    On June 3, 2019, Radspieler attended the next meeting of the City Commission and asked the Commission to have the police leave him alone.  The next day, Radspieler found a Violation Notice hidden in the door frame of the Orleans house.  The notice alleged blight violations for trash on the premises, high grass, and "rooftop antenna falling."  The notice was signed by officer McGehee.  A neighboring house also had a rooftop antenna falling, but the owner of that house received no notice of violation.

45.    On June 17, 2019, at a City Commission meeting, Commissioner Milhiem told Radspieler that Radspieler was a non-resident who owns houses in the City, and, "We want you to leave town."

46.    **408 Platt Street**: In about 2014, a property owner on the corner of Platt St. and Morrell bulldozed trash, dirt, and dog feces from his yard onto the yard of 408 Platt St.  For four years, the mound sat there, and the City issued no violation notices or civil infractions and did nothing else to remedy the situation.  On September 17, 2018, Radspieler bought the property at 408 Platt St. for $29,000.00. On April 23, 2019, June 6, 2019, and June 13, 2019, the City issued violation notices

to Radspieler about the pile in the yard at 408 Platt St.

47.     Before Radspieler bought the property at 408 Platt St., the City put its assessed value at $20,000.00.   In 2019, after Radspieler bought the property, the City raised the assessment value to $27,000.00.  Radspieler appealed to the Board of Review which reduced the assessed value to $20,000.00.  But then, the City raised the assessed value to $29,200.00.

48.     Chief Konkle also issued notices of violation against Radspieler for alleged tall grass and branches placed on the curb too early.  But Konkle did not issue such notices to neighbors with the same conditions on their properties.

49.     After Chief Konkle retired from the Police Department, the harassing notices of violation and civil infractions stopped.

### COUNT I: ILLEGAL STOP AND USE OF EXCESSIVE FORCE, CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C.A. § 1983

**(Against Defendant *Brandon Weber, Gordon Konkel, Ostego Police Department and City of Otsego*)**

50.     Radspieler realleges and incorporates by reference, as though fully set forth here, each and every allegation set forth in the above Paragraphs.

51.     This cause of action is brought pursuant to 42 U.S.C.A. § 1983 and the United States Constitution.

52.     On or before August 19, 2017 Plaintiff possessed the rights guaranteed by the United States Constitution, including but not limited to the Fourth and

Fourteenth Amendment rights against unlawful and unreasonable search, seizure, and use of excessive force by means of unwarranted threats, and the right to be free from unlawful detention and/or arrest by police officers acting under the color of law.

53.    On August 19, 2017, Weber stopped Radspieler in his truck without probable cause and illegally seized, detained and/or arrested Radspieler with reckless disregard of his civil rights, as set forth in detail in Radspieler's factual allegations.

54.    On August 19, 2017, Weber acted with deliberate indifference or with reckless disregard for Radspieler's rights when Weber assaulted Radspieler with a firearm without probable cause and/or legal justification, as set forth in detail in Radspieler's factual allegations, and on information and belief Weber failed to comply with department procedures.

55.    At the time of the described wrongful acts by Weber, Radspieler was not engaged in criminal activity of any nature to warrant the seizure and assault or unlawful threats under the color of law made against him. At the time of the wrongful acts by Weber, Radspieler was not displaying any behavior to justify being unreasonably detained, and assaulted by Weber. Moreover, Weber lacked probable cause, reasonable suspicion or legal justification to detain and/or arrest Radspieler on any basis.

56.     The unreasonable seizure of Radspieler was entirely unjustified by any of his action, and constituted violations of his civil rights.

57.     The unlawful stop, seizure, and assault of Radspieler was the proximate cause of the damages suffered by Radspieler who not only was unreasonably detained for the purposes of the traffic stop, but was forced under color of law to endure being threatened with a firearm.

58.     On August 19, 2017, Weber acted specifically with the intent to deprive Radspieler of the following rights under the United States Constitution:

(a) Freedom from unreasonable searches;

(b) Freedom from use of excessive force by a police officer;

(c) Freedom from unreasonable seizures in the form of unlawful detention and/or arrest by police officers;

(d) Freedom from a deprivation of Liberty without due process of law;

(e) Freedom from summary punishment;

(f) Freedom from threat of harm under color of law; and

(g) Freedom to move about freely as a citizen of the United States of America.

59.     Weber subjected Radspieler to the mentioned deprivations either by actual malice, deliberate indifference or reckless disregard for his rights under the United States Constitution and the laws of the State of Michigan.

60.     Weber acted at all times knowing that his conduct went against the

authorized practices, customs, procedures and policies of Otsego Police Department and was unlawful conduct in violation of the Fourth Amendment and the laws of the State of Michigan. However, Weber knew that Defendants City and the City's Police Department, acting through the chief policymaker Chief Konkle, had ratified, condoned, and acquiesced to his specific acts of intimidation and abusive conduct through unauthorized, yet established practices, customs and procedures and thus did not fear any repercussion from Defendant City, or Defendant Konkle in taking the unlawful action against Radspieler.

61. As the direct and proximate cause of the mentioned acts of Defendants, Radspieler suffered psychological injury and severe emotional distress.

62. By reason of the mentioned acts and omissions of Defendants, Radspieler was caused to incur legal expenses and general damages in an amount to be proved at trial.

63. By reason of the mentioned acts and omissions of Defendants, Radspieler was required to retain counsel to institute and prosecute this action, and Radspieler requests payment by Defendants of a reasonable sum as and for attorney's fees pursuant to 42 U.S.C.A. § 1988.

64. The mentioned acts of Defendants were willful, wanton, malicious and oppressive, thus justifying the awarding of exemplary and punitive damages as to the individually-named Defendants.

## COUNT II: STATE VIOLATIONS: ASSAULT AND FALSE IMPRISONMENT
## (Against Defendant Weber, Konkle, Otsego Police Department, and City of Otsego)

65.     Radspieler realleges and incorporates by reference all factual contents of the above Paragraphs as if fully set forth here.

66.     This cause of action is brought pursuant to MCL 750.82 and the civil laws of the State of Michigan.

67.     Weber committed the offense of assault with dangerous weapon by (1) assaulting Radspieler (2) with dangerous weapon (3) with intent to injure or place victim in reasonable fear or apprehension of an immediate battery.

68.     Weber committed the offense of false imprisonment because (1) Weber performed an act committed with the intention of confining Radspieler, (2) Weber performed an act directly or indirectly resulting in such confinement, and (3) Radspieler was conscious of his confinement.

69.     The assault on and unreasonable search and seizure of Radspieler was entirely unjustified by any of the actions of Radspieler and constituted violations of his state and federal civil rights.

70.     The unlawful assault, seizure, detention and/or arrest of Radspieler was the proximate cause of the damages suffered by Radspieler, who not only was unreasonably detained for the purposes of the traffic stop, but was forced under color of law to suffer an assault.

71.     Weber subjected Radspieler to the mentioned deprivations by actual malice, deliberate indifference and reckless disregard for their rights under the United States Constitution and the laws of the State of Michigan.

72.     Weber acted at all times knowing that his conduct went against the authorized practices, customs, procedures and policies of Otsego Police Department and was unlawful conduct in violation of the Fourth Amendment and the laws of the State of Michigan.   However, Weber knew that Defendants City and the City's Police Department, acting through the chief policymaker Chief Konkle had ratified, condoned, and acquiesced to his specific acts of intimidation and abusive conduct through unauthorized, yet established practices, customs and procedures and thus did not fear any repercussion from Defendant City, or Defendant Konkle in taking the unlawful action against Radspieler.

73.     As the direct and proximate cause of the mentioned acts of Defendants, Radspieler suffered psychological injury and severe emotional distress.

74.     By reason of the mentioned acts and omissions of Defendants, Radspieler was caused to incur legal expenses and general damages in an amount to be proved at trial.

75.     By reason of the mentioned acts and omissions of Defendants, Radspieler was required to retain counsel to institute and prosecute this action, and Radspieler requests payment by Defendants of a reasonable sum as and for

attorney's fees pursuant to 42 U.S.C.A. § 1988.

76.     The mentioned acts of Defendants were willful, wanton, malicious and oppressive, thus justifying the awarding of exemplary and punitive damages as to the individually-named Defendants.

## COUNT III:  MUNICIPALITY LIABILITY FOR CONSTITUTIONAL VIOLATIONS
**(Against Defendant City of Otsego)**

77.     Radspieler realleges and incorporates by reference all factual contents of the above Paragraphs, as if fully set forth here.

78.     This cause of action is brought pursuant to 42 U.S.C.A. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

79.     On August 19, 2017, Defendant Weber violated Radspieler's constitutional rights by illegally stopping, detaining and arresting him and assaulting him with a firearm.

80.     At all times relevant, Weber was an agent and employee of Defendant City and carrying out the acts alleged while acting under color of the authority and under color of the statutes, regulations, customs, and usages of Defendant Police Department and Defendant City, pursuant to a set pattern, practice, and official policy of Defendant Police Department and Defendant City.

81.     At the time of the assault against Radspieler, and the false detention, seizure, and arrest of Radspieler, Defendant City had in place and had ratified

policies, procedures, customs and practices which permitted and encouraged their police officers to unjustifiably, unreasonably violate the Fourth and Fourteenth Amendments, use unreasonable and unjustifiable procedures against motorists arbitrarily, including threatening and abusive behavior. These policies, procedures, customs and practices also called for Defendant Police Department and Defendant City not to discipline, prosecute or in any way take corrective or responsive action to known incidents and/or complaints of excessive force via unwarranted threats, brandishing of firearms, false detention and/or arrests by its officers or the related claims and lawsuits resulting from same.

82.     The mentioned policies, procedures, customs and practices called for the refusal of Defendant Police Department and Defendant City to investigate or document complaints of previous incidents of assaults, offensive touching, threats, false detentions and/or arrests. Instead, these Defendants officially claimed that such incidents were justified and proper, or simply failed to report the misconduct.

83.     Defendant City's policies, procedures, customs and practices of inaction and cover-up encouraged officers of the Defendant Police Department to believe that unlawful, assaults, offensive touching, threats, false detentions and/or arrests against individuals were permissible. Defendant City had final policymaking authority over Defendant Police Department and officer Weber and ratified their acts.

84.     The mentioned policies, procedures, customs and practices of Defendant City evidenced a deliberate indifference to the violations of the constitutional rights of Radspieler. This indifference was manifested by the failure to discipline Weber or to change, correct, revoke, or rescind these policies involving inappropriate and offensive touching, unwarranted threats, false detentions and/or arrests.

85.     Defendants demonstrated deliberate indifference to the civil rights of motorists and other victims of assaults, offensive touching, unwarranted threats, false detentions and/or arrests, which was also evidenced by Defendants Police Department and Defendant City ignoring the history and pattern of prior civil complaints and claims alleging civil right for misconduct similar to that alleged in this Complaint.   Several years back, another motorist suffered a similar assault with a firearm by a City police officer who stopped him for an allege traffic violation. That motorist, a business owner in a company vehicle, stopped and got out of his truck to meet the officer.   The officer pulled out his gun pointed it between the motorist's eyes and ordered him back into his truck.   Shaken, the motorist complied. The motorist reported the incident to Chief Konkle.   Konkle said the officer might have overreacted but imposed no consequences on the officer.

86.     Chief Konkle, in particular, exhibited such indifference to Weber's actions by failing to acknowledge that officer Weber lied about having chased

25

Radspieler over three blocks.  The audio-video recording of the incident, which Konkle had in his possession, clearly shows that Weber lied about that and that Radspieler merely crawled the length of about 4 house lots when he put on his turn signal to turn left into his property.  Konkle's failure to acknowledge Weber's false statement and its effect on the propriety of his actions against Radspieler are a manifestation of the actual unwritten City policy of allowing officers to assault motorists without justification.  Konkle also orchestrated the withholding of Weber's "use of force" report from Radspieler.   Konkle orchestrated the continuing harassment against Radspieler by discriminatory enforcement of blight ordinances all to retaliate for Radspieler's speech about corruption in the police department and to dissuade Radspieler from further speaking out to the citizens of the City.

87.    Konkle had complete and final authority over discipline, discharge, work rules, and all other policies in the Police Department.  Konkle was the highestranking City official in the department and was an official whose edicts or acts may fairly be said to represent official policy.

88.    Moreover, Konkle's persistent failure to discipline subordinates who violate persons' civil rights gives rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct.  Konkle's failure to properly investigate and address allegations of excessive force allowed such force to become an accepted custom or practice of the Police Department.

89.     Other systemic deficiencies that have indicated and continue to indicate deliberate indifference by Defendants Police Department and City to the violations of the civil rights of individuals such as Radspieler by Officers include the following:

(a)     Preparation of investigative reports designed to vindicate the use of force, false detentions and/or arrests;

(b)     Preparation of investigation reports which rely solely on the word of the Police Officers involved in complaints of offensive touching, illegal threats, and incidents of false detentions and/or arrests which systematically fail to credit testimony of non-Police Officer witnesses;

(c)     Preparation of investigative reports that omit factual information and physical evidence that contradicts the accounts of the Officers involved in the misconduct;

(d)     Acquiescence and/or a tacit agreement to a "code of silence" that permeates all levels of the chain of command within Defendant Police Department and serves to insulate and protect Officers who engage in civil rights violations.

90.     The foregoing acts, omissions, and systematic deficiencies are policies and customs of Defendants Police Department and City and as such cause Defendant Police Officers to believe that offensive touching, excessive force by means of unwarranted threats, false detentions and/or arrests are permissible and that such misconduct would not be honestly and properly investigated, all with the foreseeable

result that Defendant Officers would engage in violations of the civil rights of citizens and residents of this State.

91.    As the result of the mentioned acts, omissions, systematic deficiencies, policies, procedures, customs and practices of Defendants Police Department and City, Defendant Weber inflicted injuries on Radspieler or otherwise caused and/or facilitated the damages and harm against Radspieler that resulted in emotional and psychological injuries.

92.    As a direct and proximate cause of the mentioned policies, procedures, customs, and practices of Defendants Police Department and City, Radspieler suffered severe emotional distress.

93.    By reason of the mentioned acts and omissions of Defendants Police Department and City, Radspieler was forced to incur attorney fees and general damages, in an amount to be proved at trial.

94.    By reason of the mentioned acts and omissions of Defendants Police Department and City, Radspieler was required to retain counsel and institute and prosecute this action, and Plaintiffs request payment by Defendants of a reasonable sum as and for attorney's fees pursuant to 42 U.S.C.A. § 1983.

## COUNT IV:  VIOLATION OF EQUAL PROTECTION OF THE LAWS
**(Against Defendant Konkle, and City of Otsego)**

95.    Radspieler realleges and incorporates by reference all factual contents

of the above Paragraphs, as if fully set forth here.

96.     This cause of action is brought pursuant to 42 U.S.C.A. § 1983 and the Fifth and Fourteenth Amendments of the United States Constitution.

97.     Radspieler was similarly situated with the prior owners of the properties set out in the factual allegations of this Complaint, because, where applicable, the same conditions existed immediately before Radspieler purchased the properties as existed immediately after Radspieler purchased the properties.

98.     Yet, Chief Konkle and the other City officials and employees that Konkle orchestrated, treated Radspieler differently than the prior owners of the properties.  Konkle discriminatorily enforced against Radspieler, but not against prior owners, the City code sections regarding preexisting rubbish and regarding construction materials culled in the process of restoring the houses.

99.     Radspieler was similarly situated with the other property owners of the same neighborhood as the properties set out in the factual allegations of this Complaint, because, where applicable, the same or worse conditions existed on the property of the neighbors as existed on Radspelier's properties.

100.    Yet, Chief Konkle and the other City officials and employees that Konkle orchestrated, treated Radspieler differently than the other property owners in the same neighborhood.  Konkle discriminatorily enforced against Radspieler, but not against the other property owners, the City code sections regarding rubbish and

regarding construction materials culled in the process of restoring the houses.

101.  Radspieler was similarly situated with the prior owners of the properties he purchased, because the properties were in the same condition immediately before and immediately after the sales.

102.  Yet, the City treated Radspieler differently than the prior owners.  Even though the properties were in terrible condition (and before the sales, some had been condemned and ordered demolished by the City), the City refused to lower the assessed value of the properties, and in fact raised the assessed value, after Radspieler purchased the properties.  When the Board of Review lowered the assessed value, the City defiantly raised the values again.

103.  There is no rational basis for the differing treatment of Radspieler.  The City's differing treatment of Radspieler was motivated by personal malice against Radspieler.

104.  Chief Konkle's motivation for his differing treatment of Radspieler was rooted in Konkle's intent to retaliate against Radspieler for his challenge to the propriety of Weber's actions on August 19, 2017 and Radspieler's challenge to the denial of his FOIA request for Weber's "use of force" report.  Also, Chief Konkle's motivation for his differing treatment of Radspieler was rooted in Konkle's intent to intimidate Radspieler to stop Radspieler from speaking out about Weber's assault with a firearm and about Konkle's failure to discipline Weber.  Scharphorn the

building inspector and code enforcement officer told Radspieler that Chief Konkle had ordered "an ugly cop named McGehee to get you."  Scharphorn told Radspieler "They are out to get you."

105.   Konkle had complete and final authority over the policies in the Police Department, including policies concerning issuance of blight notices and civil infractions.  Konkle was the highest-ranking City official in the department and was an official whose edicts or acts may fairly be said to represent official policy.

106.   The malicious animus of the City Commission was made expressly clear.  On June 17, 2019, at a City Commission meeting, Commissioner Milhiem told Radspieler he was a non-resident who owns houses in the City, and said, "We want you to leave town."

107.   As a direct and proximate cause of the mentioned policies, procedures, customs, and practices of Defendants Konkle and the City, Radspieler suffered severe emotional distress.

108.   By reason of the mentioned acts and omissions of Defendants Konkle and City, Radspieler was forced to incur special damages, including excess property taxes paid, and general damages, in an amount to be proved at trial.

109.   By reason of the mentioned acts and omissions of Defendants Konkle and the City, Radspieler was required to retain counsel and institute and prosecute this action, and Plaintiffs request payment by Defendants of a reasonable sum as and

for attorney's fees pursuant to 42 U.S.C.A. § 1983.

## COUNT V:  VIOLATION OF GUARANTEE OF FREE SPEECH
**(Against Defendant Konkle, and City of Otsego)**

110.   Radspieler realleges and incorporates by reference all factual contents of the above Paragraphs, as if fully set forth here.

111.   This cause of action is brought pursuant to 42 U.S.C.A. § 1983 and the First and Fourteenth Amendments of the United States Constitution.

112.   Radspieler engaged in protected speech by telling Konkle about how Weber assaulted him with a gun and how Weber lied in his "use of force" report in which Weber said Radspieler fled and eluded for at least three blocks.

113.   Radspieler engaged in protected speech by stating, at the hearing in circuit court regarding his challenge to the denial of his FOIA request, that Weber had lied in his use of force report, that the City officials and particularly Konkle were corrupt and were shielding Weber from discipline for excessive use of force, and that he (Radspieler) wanted the citizens of Otsego to know about the former.

114.   Radspieler engaged in protective speech on June 3, 2019, by attending the meeting of the City Commission, complaining about harassment from the police and asking the Commission to have the police leave him alone.

115.   As a result of Radspieler's protected speech, Konkle, with the support of the City Commission, discriminated against Radspieler by issuing warning

notices and civil infractions against him for alleged blight code violations.

116.    As a result of Radspieler's protected speech, the City Assessor, with the support of the City Commission, discriminated against Radspieler by issuing inflated assessments of the value of his properties.

117.    As the result of the mentioned acts, omissions, systematic deficiencies, policies, procedures, customs and practices of Defendants Konkle and the City, Defendants Konkle and the City Assessor inflicted injuries on Radspierler or otherwise caused and/or facilitated the damages and harm against Radspieler that resulted in monetary, emotional and psychological injuries.

118.    As a direct and proximate cause of the mentioned policies, procedures, customs, and practices of Defendants, Radspieler suffered severe emotional distress.

119.    By reason of the mentioned acts and omissions of Defendants, Radspieler was forced to incur special damages from excess property taxes paid, and general damages, in an amount to be proved at trial.

120.    By reason of the mentioned acts and omissions of Defendants Konkle and the City, Radspieler was required to retain counsel and institute and prosecute this action, and Plaintiffs request payment by Defendants of a reasonable sum as and for attorney's fees pursuant to 42 U.S.C.A. § 1983.

**RELIEF REQUESTED:**

WHEREFORE, Radspieler requests judgment against Defendants, and each
of them, for:

1. General and special damages, according to proof;

2. Punitive and exemplary damages against all Defendants sued in their
   individual capacities in an amount sufficient to deter and to make an example
   of each such individual Defendant;

3. Preliminary and permanent injunction prohibiting the City's police officers
   from accosting motorists with firearms in situations similar to Radspieler's
   and prohibiting the City officials and employees from imposing on Radspieler
   discriminatory and retaliatory blight code enforcement and inflated assessed
   values for his properties.

4. Pre- and postjudgment interest;

5. Attorney's fees and costs of suit; and

6. Such other and further relief as this honorable court deems just and proper.

Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
4125 Cumberland Court
Commerce Township, MI 48390
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598

Date: August 18, 2020

I declare that the statements above are true to the best of my information, knowledge, and belief.

*Albert Radspieler*

ALBERT RADSPIELER

Signed and sworn to before me in Allegan County, Michigan, on August 15, 2020.

ROBERT L. LEVI
Notary Public, State of Michigan
County of Oakland
My Commission Expires 05-09-2026
Acting in the County of _Allegan_

Notary's
Stamp
(above)

Notary's
Signature

35

# **JURY DEMAND**

The Plaintiff demands a jury to try this cause.

Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
4125 Cumberland Court
Commerce Township, MI 48390
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598

Date: August 18, 2020