UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ALBERT J. RADSPIELER II, et al.,

      Plaintiffs,

v.                                                                        Case No. 1:20-cv-777

CITY OF OTSEGO, MICHIGAN, et al.,                   Hon. Hala Y. Jarbou

      Defendants.

_____/

## OPINION

This is a civil rights action brought under 42 U.S.C. § 1983.  Briefly, Plaintiff Albert J. Radspieler II alleges that Otsego police officer Brandon Weber unlawfully pulled him over for speeding and subsequently threatened him with a firearm.  Radspieler's efforts to complain about and publicize his encounter with Weber allegedly resulted in a campaign of retaliation by Otsego officials, particularly then-Police Chief Gordon Konkle.  Before the Court is Radspieler's motion for leave to file an amended complaint.  (ECF No. 30.)

The amended complaint would do six things: (1) provide Radspieler's full legal name, Albert J. Radspieler II; (2) add The Albert J. Radspieler II Revocable Trust No. 1 as a Plaintiff; (3) remove the Otsego Police Department as a Defendant; (4) add City Assessor Kevin Harris as a Defendant; (5) provide more allegations regarding the speed limit on the road where Weber stopped Radspieler; and (6) provide more allegations regarding Konkle's failure to discipline Weber for prior misconduct.  Defendants do not oppose the first three amendments, but argue that the proposed amendments regarding the final three items are futile and should be denied.  The Court agrees that the proposed allegations relating to amendments 4 and 5 are futile, but the extra

allegations pertaining to Weber's allegedly unchecked misconduct are not futile.  Radspieler's

motion will be granted in part.

## I. Background

### A. Traffic Stop

The following allegations are taken from Radspieler's proposed amended complaint.

(Proposed Am. Compl., ECF No. 32-3.)  On August 19, 2017, Radspieler, a seventy-six-year-old

man, was driving in the City of Otsego.  While driving on River Street, near Watson Road, Weber

passed Radspieler in the opposite lane, then turned around and began to follow Radspieler.

Suspecting that the officer intended to pull him over, Radspieler stopped his car in the road, opened

his door, and yelled to Weber that he would pull into his driveway, just about four houses away

and within sight.  Radspieler did not simply pull over because River Street is "a two-lane road with

insufficient space on the side of the road to accommodate a vehicle."  (*Id.*, PageID.239.)

As Radspieler continued toward his property, Weber briefly sounded his siren while

following.  Radspieler stopped and activated his left turn signal to indicate that he would turn into

the nearest driveway.  Before executing the turn, Radspieler looked in his rearview mirror and

noticed Weber had exited his vehicle.  Radspieler again opened his car door to communicate with

Weber and saw the officer "approaching . . . with gun drawn and pointed at Radspieler's face."

(*Id.*)  Weber holstered his weapon and explained that he had drawn it "because he thought

Radspieler 'might be an ISIS terrorist.'"  (*Id.*)  Weber told Radspieler he was being stopped for

driving forty-four miles per hour in a zone where the speed limit was twenty-five.  Radspieler

received a speeding ticket.  Radspieler later went to court regarding the ticket, where he admitted

to impeding traffic (for staying in the middle of the road when Weber stopped him) but did not

admit to speeding.  The speeding charge was dismissed and Radspieler paid a fine.

### B. Legal Battle

Shaken by the encounter with Weber, Radspieler met with Otsego Police Chief Konkle a few days later to inquire when Otsego police are permitted to draw their weapons on citizens. The conversation moved to the August 19 traffic stop. Konkle recited a report authored by Weber regarding the incident (Weber Report). The Weber Report indicated that "Radspieler was fleeing . . . and that Weber had 'chased him at least three blocks.'" (*Id.*, PageID.248.) Konkle stated that the rest of the Weber Report was illegible. Radspieler disputed the Weber Report's account and gave Konkle his version of the facts. Radspieler requested a copy of the Weber Report, but Konkle refused, saying that it was not a true police report but instead an "evaluative piece" that did not have to be turned over. (*Id.*, PageID.249.) Konkle did provide Radspieler with Weber's dash cam footage of the incident, which apparently contradicts the facts contained in the report. The police chief concluded that Weber acted appropriately and refused to discipline him for his conduct during the August 19 traffic stop.

Dissatisfied, Radspieler tried to obtain the Weber Report through other channels. A few days after meeting with Konkle, Radspieler went to the city clerk and requested a copy of the Weber Report. The clerk refused. Radspieler made a series of requests under the Michigan Freedom of Information Act, Mich. Comp. Laws § 15.231 *et seq* (FOIA). These requests were denied for varying reasons. So Radspieler went to court. He filed a complaint in the 48th Judicial Circuit Court to appeal the denial of the FOIA requests. The City of Otsego moved for summary disposition. Various city officials, including the mayor and her husband, Konkle, the city manager, and the city clerk, attended the summary disposition hearing. At the hearing, Radspieler stated that he wanted the Weber Report "(1) to show the public that Weber had acted wrongfully, (2) to show that the City officials were corrupt and were covering up Weber's wrongdoing, and (3) to

show that Weber lied when he said that Radspieler fled and eluded Weber for over three blocks."
(*Id.*, PageID.250.)

### C. Retaliation

According to Radspieler, Otsego officials did not appreciate the lawsuit.[1]  He says that
"Konkle orchestrated a campaign of harassment and discrimination against Radspieler in
retaliation for Radspieler speaking out publicly about Weber's illegal stop and use of excessive
force, about Konkle's refusal to impose any consequences on Weber, and about the City's refusal
to release [the Weber Report]." (*Id.*, PageID.251.)  The alleged retaliation primarily took the form
of selective enforcement of city ordinances against Radspieler.

Through his trust, Radspieler buys old and run-down houses in Otsego to repair and resell
them.  The properties he purchased often had miscellaneous junk lying around the yard.  Radspieler
occasionally leaves construction materials out while working on a home refurbishment.
Technically, such things violated the City's Blight Code, but Radspieler never got written up.
After the Weber Report litigation, however, Radspieler started to receive many written infractions
for Blight Code violations.  Radspieler says only his properties were written up, even though
adjacent lots also had rubbish and other objects strewn about their yards.  Even though Otsego
hired building inspectors to enforce the Blight Code, Radspieler alleges that Konkle began
personally inspecting his properties.  Radspieler received many infractions; his neighbors received
none.  A building inspector told Radspieler that "he disagreed with how the City was treating
Radspieler and his restoration of the houses in the City" and warned him that "'[t]hey are out to
get you.'"  (*Id.*, PageID.256.)

---

[1] It is not clear whether Radspieler succeeded in his efforts to obtain the Weber Report.

4

Radspieler alleges that City Assessor Harris also participated in the retaliation campaign. In September 2017, Radspieler bought a property slated for demolition for $2,500. Some time before the August traffic stop, Konkle told Radspieler that "'[t]here should not be any [expletive] taxes [on the property] at all, because it is in so bad a condition.'" (*Id.*, PageID.254.) But later, after the legal fight over the Weber Report, Radspieler alleges that Harris "would not decrease the value even though the house was in terrible shape." (*Id.*) Shortly after Radspieler purchased another derelict property for $29,000, Harris raised the assessed value from $20,000 to $27,000. Radspieler appealed to the City's board of review, which reversed Harris. Harris then raised the assessed value to $29,200.

**D. Supervision of Weber**

Radspieler also alleges that Weber had a history of questionable interactions with citizens but was never disciplined by Konkle. In August 2016, Weber and a public safety officer with the Plainwell Police Department were dealing with "a female citizen who was being combative in the back of a patrol car." (*Id.*, PageID.261.) Weber "placed a tazer in the small of [her] back/shoulder region and threatened to kill [her]." (*Id.*) The public safety officer reported the incident to his sergeant, who forwarded the report to Konkle. Weber denied making the threat. Konkle did not discipline him.

In April 2016, a female citizen complained that, during a dispute about her dog, Weber "said she was being 'a little pain in the ass.'" (*Id.*) The woman objected, and Weber responded in a condescending manner. He also stated "'[w]ho's to say that something didn't just slip out when I was talking to you.'" (*Id.*) Konkle later met with Weber regarding the incident, and Weber denied using profanity. Weber was not disciplined.

In July 2020, Weber "chased a man on an ATV for a petty civil infraction over five miles, off-road, over a residential yard and a farmer's field. Weber pursued the driver at speeds of up to

5

65 [miles per hour] with citizens and vehicular traffic in the vicinity." (*Id.*, PageID.261-262.)  He

allegedly shouted profanities at the ATV driver through his patrol car's PA system.  By this time,

Konkle retired and Otsego had a new police chief.  The new chief asked Weber why he would

engage in a high-speed chase over a petty civil infraction.  Weber replied that he "'wanted to catch

that motherfucker.'" (*Id.*, PageID.262.)  Weber received a written reprimand.

## II. Standards

### A. Leave to Amend

"A party may amend its pleading once as a matter of course" within 21 days of service.

Fed. R. Civ. P. 15(a)(1)(A).  Where the 21-day period has elapsed, "[t]he court should freely give

leave" to amend a pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A "district court

may weigh the following factors when considering a motion to amend: undue delay or bad faith in

filing the motion, repeated failures to cure previously-identified deficiencies, futility of the

proposed amendment, and lack of notice or undue prejudice to the opposing party." *Knight Capital*

*Partners Corp. v. Henckel AG & Co.*, 930 F.3d 775, 786 (6th Cir. 2019).  Futility exists where "the

pleading as amended could not withstand a motion to dismiss."  *Hoover v. Langston Equip.*

*Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992) (internal quotations omitted).

### B. Failure to State a Claim

To determine whether a pleading fails to state a claim, courts must ask whether the plaintiff

has alleged "facts that, if accepted as true, are sufficient to raise a right to relief above the

speculative level,' and . . . 'state a claim to relief that is plausible on its face.'" *Hensley Mfg. v.*

*ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw a reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausible does not mean probable, but the

standard "asks for more than a sheer possibility that a defendant has acted unlawfully . . . . Where a plaintiff pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

On a motion to dismiss, courts must accept factual allegations as true, but will reject conclusory statements as "not entitled to the assumption of truth." *Id.* (citing *Twombly*, 550 U.S. at 555-56). Hence, courts will ignore conclusory assertions and, accepting well-pleaded factual allegations as true, determine whether the allegations "plausibly give rise to an entitlement to relief." *Id.* Determining the plausibility of a claim is a "context-specific" inquiry, "requiring the reviewing court to draw on its experience and common sense." *Id.* If the Court decides that there is no plausible claim to relief, then the plaintiff has failed to state a claim.

### III. Analysis

Defendants challenge three broad purposes of the proposed amendments: (1) adding Harris as a Defendant; (2) the expansion of Radspieler's claims against the City "based upon a lack of a traffic control order"; and (3) the expansion of Radspieler's claims against the City and Konkle for failing to discipline Weber for alleged misconduct prior to the August 2017 traffic stop. (Defs.' Opp. Br., ECF No. 36, PageID.333.) The proposed amendments with respect to Harris and the lack of a traffic control order are futile. The new allegations regarding Weber's prior misconduct are not.

#### A. Adding Harris as a Defendant

Radspieler wishes to sue Harris both as an individual and in his official capacity as City Assessor. (Proposed Am. Compl., PageID.237.) Defendants argue that Harris cannot be sued in his official capacity because such a claim ultimately flows against the City and is therefore

duplicative.  (Defs.' Opp. Br., PageID.334.)  However, it is not clear to the Court where Harris is even being sued in his official capacity.

Radspieler brings four counts.  Count I alleges an illegal stop, use of excessive force, and "constitutional violations" against Weber and the City.  (Proposed Am. Compl., PageID.258.) Count II seeks to impose municipal liability on the City for violations of the Fourth and Fourteenth Amendments.  (*Id.*, PageID.263.)  But the allegations in Count II make no mention of the allegedly improper property value assessments.  Count III alleges equal protection violations by Konkle and Harris individually, but this claim is not brought against the City.  (*Id.*, PageID.269.)  Count IV asserts a First Amendment violation by Konkle alone.  (*Id.*, PageID.272.)

From these claims, the Court does not see where Radspieler seeks to hold any Defendant liable for Harris' actions in his official capacity.  Under the notice-pleading standard, courts are not to nitpick allegations or deny a plaintiff his day in court for an inelegant complaint.  *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (The "'basic objective'" of the Federal Rules of Civil Procedure "'is to avoid civil cases turning on technicalities.'" (quoting 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1215 (2d ed. 1995))).  But defendants must know how they are to be held liable for their alleged misconduct.  The Court cannot discern how an action against Harris in his official capacity fits into any of the claims brought.  The relevant proposed amendments are thus futile and may not be added to the complaint.

Count III names Harris in his individual capacity.  The scant allegations against him are insufficient.   Harris  purportedly  raised  the  assessed  property  values  on  several  properties purchased by Radspieler.  Radspieler asserts that these actions were another facet of the City's retaliation campaign.  But there is no indication that Harris raised property assessments for malicious reasons.  Radspieler also alleges that he was treated differently compared to previous

owners of the properties he purchased.  However, unlike his allegations against Konkle, nothing

indicates that Radspieler was treated worse than *other*, contemporaneous property owners.  He

says that blight ordinances were selectively enforced against him alone, but does not make such

allegations with respect to property value assessments.  Radspieler has not stated a claim against

Harris and the proposed allegations against him will be denied.

### B. The Speed Limit on River Street

Radspieler's proposed amendments would add a slew of allegations speaking to the speed

limit on River Street when he was stopped by Weber in August 2017.  The gravamen of these

allegations is that, though there was a posted speed limit of twenty-five miles per hour, the City's

failure to enact proper laws meant that the posted speed limit was ineffective.  Without such proper

laws in effect, the speed limit on River Street would be governed by Michigan's "basic speed law,"

Mich. Comp. Laws § 257.627(1).  The basic speed law states that:

> [a] person operating a vehicle on a highway shall operate that vehicle at a careful
> and prudent speed not greater than nor less than is reasonable and proper, having
> due regard to the traffic, surface, and width of the highway and of any other
> condition existing at the time.  A person shall not operate a vehicle upon a highway
> at a speed greater than that which will permit a stop within the assured, clear
> distance ahead.

*Id.*

The legal speed limit is vital to Radspieler's claim against the City of Otsego.

Municipalities can be held liable if their policies or actions result in a violation of constitutional

rights.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).  So-called

*Monell* claims can also be brought where a municipality's *failure* to act "evidences a deliberate

indifference to the constitutional rights of its inhabitants."  *City of Canton v. Harris* 489 U.S. 378,

389 (1989).  A successful deliberate indifference claim requires causation, i.e. the plaintiff must

prove that his constitutional rights *would not* have been violated *if* the municipality had acted.  *Id.*

Here, therefore, Radspieler must show that he was illegally stopped by Weber and that the illegal stop would not have occurred if the City had passed appropriate laws effectuating the posted speed limit or instead instructed police that the basic speed law governed River Street.  The problem is that Radspieler has not shown that he was illegally stopped.  Assuming the basic speed law governed the relevant portion of River Street, Radspieler must show that he was driving at a "reasonable and proper" speed under the circumstances.  If Radspieler was driving at a speed that violated the basic speed law, then the challenged traffic stop was not unlawful.  This is true even if Weber pulled him over on the false premise of violating the posted speed limit of twenty-five miles per hour.  *Whren v. United States*, 517 U.S. 806, 810 (1996) (traffic stop is reasonable, regardless of subjective intent, where there is probable cause of violation); *see Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (only reasonable suspicion of traffic violation required to stop a vehicle).

In his reply brief, Radspieler states that he "was not travelling at an unsafe speed" in violation of the basic speed law.  (Pls.' Reply Br., ECF No. 45, PageID.483.)  But he makes no such allegation in his proposed amended complaint.  What matters is not what he asserts in briefs, but what is contained in the complaint.  Without any allegations regarding his speed or other indicia of compliance with the basic speed law, Radspieler cannot say that he would not have been pulled over by Weber if the City had properly enacted laws.  Indeed, he cannot even say that he would not have been pulled over if Weber had been applying the basic speed law rather than the posted twenty-five mile per hour limit, as he was apparently required to do.  The proposed allegations regarding the true speed limit on River Street fall short of stating a claim and are therefore futile.

### C. Supervision of Weber

Radspieler also asserts that Weber drawing his gun during the August traffic stop gives rise to a deliberate indifference *Monell* claim against the City.  The argument is as follows: (1) Weber

10

misbehaved in past police encounters, exhibiting overly aggressive behavior; (2) Konkle knew

about such incidents but declined to discipline Weber; (3) an unchecked Weber unjustifiably pulled

his gun on Radspieler during a routine traffic stop, another instance of overly aggressive behavior

and a violation of Radspieler's constitutional rights; and (4) as evidenced by Weber's reprimand

in 2020, if Konkle had properly scolded Weber prior to August 2017, he would not have pointed

a gun at Radspieler.

This argument is built on the allegations of Weber's inappropriate behavior in April and

August 2016.  Defendants say these incidents are unsubstantiated and irrelevant and therefore do

not belong in Radspieler's complaint.  Both arguments are meritless.  For the purposes of the

present motion, Radspieler's proposed allegations are treated as true.  He says these incidents of

misconduct happened and so the Court assumes that they did.

They are also relevant.  To show deliberate indifference in the *Monell* context, Radspieler

must show that the Defendants were on notice of Weber's misconduct and realized that a failure

to act could result in future constitutional violations.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v.

Brown*, 520 U.S. 397, 410 (1997).  Notice exists only where the past misconduct is sufficiently

similar to the alleged violation behind the *Monell* claim.  *Connick v. Thompson*, 563 U.S. 51, 66-68

(2011).  In the August 2016 incident, Weber allegedly threatened to kill a "combative" woman in

the back of a patrol car.  (Proposed Am. Compl., PageID.261.)  The exact circumstances are not

entirely clear, but apparently Weber's actions were so out of bounds that another police officer

complained about it.  Similarly, Weber threatened lethal force against Radspieler for seemingly

minor misconduct.

The April 2016 incident, where Weber allegedly swore at woman about her dog, is a closer

call.  But this allegation is not as obviously futile as others addressed earlier in this opinion.

Drawing inferences in Radspieler's favor, the July 2020 incident shows that disciplinary action would have reigned in Weber's alleged misbehavior.  The Court will grant Radspieler leave to add allegations relating to Defendants' failure to supervise Weber.

### IV. Conclusion

For the foregoing reasons, the Court will grant Radspieler's motion for leave to amend in part.  He may amend the complaint to: (1) provide his full legal name; (2) add The Albert J. Radspieler II Revocable Trust No. 1 as a Plaintiff; (3) remove the Otsego Police Department as a Defendant; and (4) provide more allegations regarding Konkle's failure to discipline Weber for prior misconduct.  The proposed amendments relating to Harris as a Defendant and the speed limit on River Street are futile and Radspieler's motion will be denied in those respects.  An order will enter consistent with this Opinion.

Dated:   February 19, 2021                         /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   UNITED STATES DISTRICT JUDGE